# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00174-CR

**Stanley Earl Pates, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 368TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 18-1378-K368, THE HONORABLE RICK J. KENNON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Stanley Earl Pates was convicted of murder and sentenced to twenty-seven years' imprisonment. Tex. Penal Code §§ 12.32, 19.02. In Pates's first five issues, he alleges that the trial court erred by including or excluding various sections from the court's charge and that he was harmed by both the individual errors as well as by the cumulative effect of the errors. In his remaining two issues, Pates alleges that his trial counsel was ineffective and that the evidence was legally insufficient to support the jury's rejection of his self-defense claim and his conviction. Based on the reasons stated below, we affirm the trial court's judgment.

## BACKGROUND

On June 27, 2018, a surveillance video from a Valero gas station located in Austin, Texas, captured a shootout between the passengers of two different cars parked in front of the store. The camera was mounted on the front of the convenience store looking out on a row

of parking spots immediately in front of the store's entrance and on the gas pumps that were beyond the row of parking. Soon after a Kia parked, three juveniles exited the backseat and entered the store. The driver and front seat passenger remained in the car for a few minutes before a Volvo pulled into the parking spot next to the Kia. The cars were parked so that the Kia's driver's side door and the Volvo's passenger side door were next to each other. The passenger of the Kia, a man wearing a white t-shirt, got out of the car and stared at the Volvo for about ten seconds before getting back in the car. The passenger in the Volvo then immediately exited the vehicle with a gun in his hand, unsuccessfully tried to open the driver's side door of the Kia, and then fired his gun into the car through the driver's side window. As the Kia reversed quickly, the Volvo passenger continued to shoot at the Kia while raising his other arm in a defensive posture and moving in a manner as if he was dodging returning fire coming from the Kia. The Kia crashed into a gas pump and that vehicle's passenger exited and fled across the street. The Volvo passenger returned to the Volvo, and its driver drove them away from the scene in a different direction than the Kia passenger fled.

According to the medical examiner, the driver of the Kia, Davon Gross, died at the scene from multiple gunshot wounds. According to the lead detective on the case, the passenger of the Kia was Preston Mixson, who was detained near the crime scene, and the passenger of the Volvo was identified by Mixson to the detective as Pates, who turned himself in a couple days after the shooting after his photo and details of the offense were distributed by the media.

The State's first witness was Sergeant Scott Zion with the Williamson County police department. He testified that on June 27, 2018, at about 5pm he was driving in his patrol car when a woman in a car drove next to him and said there was a shooting at a Valero gas

2

station just around the corner and someone had been shot. He immediately headed that direction and called it in. When he arrived, he observed a silver Kia four door car backed into a gas pump. He described the scene as chaotic with many people walking around. He saw a man leaning into the passenger side of the car. Someone on the scene told Sergeant Zion that there had been a shooting. The person leaning into the Kia told him that the shooters had left already, and that the driver of the Kia had been shot. Sergeant Zion observed that the driver, who was wearing a black and white striped shirt, had several bullet wounds. Sergeant Zion called for EMS. He observed that there was bullet damage to the front driver's side window and two bullet holes in the front passenger door. A witness told him that a black male wearing a white T-shirt and black jeans fled from the Kia towards the Audi dealership across the street. Sergeant Zion advised dispatch to ask units to check that area for a person matching that description. A couple of minutes later, he was advised that a person matching that description had been detained. Sergeant Zion stayed with the injured driver for about ten minutes and regularly checked for a pulse until EMS arrived. The driver's pulse had been faint when Sergeant Zion arrived, but he "lost it" a couple minutes before EMS arrived. Once EMS arrived Sergeant Zion began securing the crime scene. EMS attempted lifesaving efforts but after a few minutes informed Sergeant Zion that the driver "had expired."

At the scene, Sergeant Zion observed in the parking spaces in front of the store that there were three parked vehicles with gunshot holes including one that had a flat tire from a bullet hole. He also observed a Smith & Wesson gun magazine and two spent shell casings on the ground that he believed to be from a .40 or .45 caliber handgun. Inside the Kia he observed shell casings that were smaller that be believed to be from a .380 or 9-millimeter pistol.

3

Austin police officers arrived on scene, and Sergeant Zion briefed them on what he had observed, passed the investigation to them, and stayed to help them with the crime scene. Sergeant Zion explained that because of the location of the Valero, both the Williamson County and City of Austin police departments had jurisdiction.

Sergeant Zion's patrol car video was played for the jury. The video showed the events as he had described them. Sergeant Zion identified crime scene photos that depicted the Kia against a gas pump at the Valero, two bullet holes in the passenger door, the deceased driver in the driver's seat of the Kia, and bullet holes through the driver's side door window and in the windshield.

The surveillance video depicting the shooting was introduced as evidence through Hemendra Shrestha, the market manager for Circle K who was assigned to the Valero store where the offense occurred. The State then called Detective David Fugitt of the Austin Police Department Homicide Unit who was the detective at the scene of the crime that worked with Shrestha to download the surveillance video. The State played both the real time surveillance video of the shooting as well as a slowed-down half-speed version.

Detective Fugitt identified the driver of the Kia as the deceased victim, and the front passenger as Mixson. He could not identify the three juveniles that exited the backseat and went into the store where they remained during the shooting. The video showed that after the shooting, the three juveniles stood around for a while before retrieving items from the car and then watched as a witness on the scene and Sergeant Zion attempted to help the driver of the Kia. Then the ambulance arrived, and the police secured the crime scene.

The State then called Mixson, the passenger of the Kia. He testified that he knew Pates from working at KFC. He testified that he didn't know where Pates lived, that he did not

4

know him outside of work, and that it had been about a year since they worked together when the shooting occurred. He identified the deceased driver of the Kia as Gross, and the juveniles from the backseat as his little brother and his brother's friend. Mixson testified he was seventeen at the time and his younger brother and his friends were fifteen or sixteen. He testified that Gross picked him and his brother up from home in Gross's grandmother's car and took them to get candy "and some other stuff" at the gas station, which was about twenty minutes away.

Mixson was waiting in the car for his little brother to get his candy when he got out of the car and saw Pates in the other car. Mixson testified that he did not say anything while outside the car. He then got back in the car and told Gross to leave. Pates then "just fired shots into the car." Pates fired more than one shot, hitting Gross. Gross yelled out, and Mixson returned fire from his gun that was in his backpack. Gross put the car in reverse and slammed on the gas. The car hit a gas pump. Mixson shook Gross to get him to crawl out, but he thought he was not alive anymore, so Mixson got out of the car and ran across the street. He testified he did not remember firing his gun as he fled.

Mixson saw a man at the Audi dealership and told him to call an ambulance. At some point, Mixson threw his gun somewhere but did not remember where. The man at the dealership pointed his gun at Mixson and told him to stay put. Police arrived soon after. EMS arrived, and Mixson was taken to the hospital for his injuries—which according to the lead detective's testimony included a minor injury to his right hand that required a bandage. There was no testimony regarding how Mixson was injured during the shooting. He was then driven to the Austin police headquarters to be interviewed by Detective Angel Polansky. During that interview, he identified Pates as the shooter by a photo, but not by name. He testified that the prosecutor had not made him any promises regarding his pending cases in Travis County.

5

On cross, the defense attorney asked questions highlighting that Mixson had given multiple conflicting stories to explain why the shooting had happened. Mixson agreed that an officer's report, which was not entered into evidence, stated that while Mixson was in the ambulance the day of the shooting, Mixson told the officer that the shooting had happened because Gross stole a small amount of marijuana from Pates "in days prior" to the shooting. Although he agreed that was what the report said, Mixson testified at trial that he never said that and that it was not true. Mixson admitted at trial that while at police headquarters, he told an unidentified police officer that the shooting was caused by a robbery committed against Pates prior to the shooting. He testified at trial that it was true that the shooting was caused by that earlier robbery and that the robbery was committed by someone named "Trey," who was the younger brother of a friend of Pates.

Mixson's backpack was found at the scene and contained multiple lighters, a Tupperware with marijuana residue, a scale "for jewelry," "paraphernalia for marijuana," a do-rag, and an extra clip loaded with thirteen rounds. He denied that the do-rag was gang related. He also testified that he did not have access to the backpack at the time of the shooting.

The defense entered a photo of a text exchange between Mixson and Pates from the night of the robbery, which read:[1]

Pates: Bro you tripping you my Lil [n***a]

Mixson: Trey told me u plotted on me

Pates: Bro wtf Ima plot on you for [n***a] I looked out for you N tre brang my

---

[1] This text exchange is reproduced because the parties presented conflicting arguments regarding what the messages substantively meant, which is relevant to issues presented on appeal. The meaning of the edited word was not disputed.

shyt back when dese folks leave

Pates: Mayne u tripping

Mixson denied knowing that the day he received those text messages was the same day that Pates had been robbed. However, Mixson agreed with defense counsel that Pates's sent text meant, "What the fuck Ima plot on you for? I looked out for you and Trey. Bring my stuff back." Although testifying that he did not know Pates outside of work, Mixson admitted to defense counsel that he knew it was Pates who texted him but said he did not know what he was talking about.

The State then called a series of witnesses who were customers that were shopping or employees that were working at the Valero the day of the shooting. Mario Arteaga testified that he was fueling his truck at a pump when he heard squealing tires as the Volvo pulled in and saw the passenger get out and yell into the Kia, and then start shooting into the Kia. However, in his statement to police the day of the shooting he told police that the two men in the Kia were the ones yelling and the one in the white shirt was shooting. Abigail Laurin Eastwood testified that she was working at Circle K during the shooting. Although she did not see the shooting, she recognized Pates when she saw his picture on the news, because he was a regular customer at the store whom she regularly had issues with him bringing in his backpack even though they are not allowed, but she explained that he was never aggressive and never stole anything.

The State then called the witness from the Audi dealership across the street where Mixson was detained. Matthew Londos testified that he was working as the parts consultant at the Audi dealership across the street from the Valero when he heard gunshots. He saw a man in

7

a white t-shirt who was holding a pistol run across the street from the Valero, behind a school, then towards him. Londos retrieved his own firearm from his car. Londos found the person in a dumpster for an apartment complex. When the man saw Londos, he engaged first saying, "help me. Help me. You've got to help me. Help me. He's coming for me. He's looking. Help me." Londos testified that neither he nor the other person pointed a gun at the other. When the man saw a silver Volvo, he ducked back into the dumpster. Londos thought the Silver car had a child in a carseat in the backseat. He did not see the Volvo again. The man showed him his hands and lifted his shirt and said, "I don't have anything." Londos told him to stay put. Londos waved down a passing Williamson County Sherriff vehicle, and the sheriff's deputies detained the man. Londos gave his statement to police.

Detective Angel Polansky-Blasingame with the Austin Police Department, the lead detective on the case, testified that she interviewed Preston Mixson at Austin Police Department Headquarters. She testified that she caught him lying throughout his statement and confronted him about the lies, which resulted in his story changing. She testified that his answers about the shooting were consistent with the surveillance video. Mixson identified Pates as the suspect after being shown a photo of him. Mixson had given the name "Stanley" at the scene. Mixson never asked about Gross but cried when Detective Polansky told him he had died.

An arrest warrant for Pates was issued. Detective Polansky's officers could not find Pates; so, the day after the shooting, she sent his picture and information to the media. The next day, Pates turned himself in to the Williamson County Jail.

When Detective Polansky viewed the surveillance video, she noticed how quick and fluid the incident was and how Pates had dropped a magazine at the scene. She also received the medical examiner's report showing that Gross died of gunshot wounds.

8

While Detective Polansky was looking for a link between Mixson and Pates, she discovered the police report from May 30, 2018, when a concerned neighbor called in a "shots fired" incident at Pates's residence. Detective Polansky testified that according to the police report Pates had told police that someone named "Pres" stole Pates's gun, pointed it at him, and fired a shot. Detective Polansky concluded that "Pres" could be Preston Mixson. The report stated that Pates did not want to give a statement or file charges and was uncooperative with police that night. Based on Pates's statement at the time, Polansky believed that the shot fired was into the air outside, not at Pates in his apartment. She also found evidence that Mixson's phone had been at Pates's apartment that night. When Polansky brought it up, Mixson completely denied it and blamed someone else. She also testified that she found no link between Gross and Pates and no indication that Pates had called 911 the day of the Valero shooting.

On cross, Detective Polansky agreed with defense counsel that sometimes victims of crimes involving gang members are hesitant to cooperate with police. She also agreed that in her experience drug dealing can be related to homicides and that drug dealing and gang membership is commonly connected. She testified that the container with residue and the scale found in Mixson's backpack were consistent with drug dealing and the bandana, or do-rag, also found in Mixson's backpack is commonly used by gang members to represent their gang membership. She testified that she was not aware of anything that suggested Mixson was involved in gangs based on her murder investigation. Mixson was not documented as a gang member. However, after getting a warrant, she searched Mixson's phone and found photos of guns and drugs and agreed that it included "stuff" that "could have been" related to gangs. After being shown an email that was not admitted into evidence, she agreed with defense counsel that

9

someone did claim Mixson was in a gang but reiterated that he was not included in any gang member database.

Sergeant John Brooks of the Austin Police Department testified about what the video the jury had already seen and heard had shown, including that when the three juveniles got out of the Kia before the offense occurred, they took a backpack with them that was found by the door of the store. This was the backpack with the scale and container inside that was discussed previously during the trial. Brooks called Justice of the Peace, Dain Johnson, to come pronounce the victim dead and have the decedent transported for an autopsy. He tried to speak to the three juveniles, but they were very uncooperative. He testified that the Volvo was connected to Marcel Hinds, who denied having anything to do with the case. Brooks met with Hinds and testified that he had long dreadlocks. According to witnesses of the shooting, the driver of the Volvo had long dreadlocks.

Amanda Aguilar testified that she was a crime scene specialist with the Austin Police Department assigned to the Valero crime scene. She confirmed that some of the shell casings were from a Smith and Wesson .40 caliber. Fourteen shell casings from a .40 caliber gun were found at the scene. The gun that was recovered at the Audi dealership was a 9-millimeter. She collected fingerprints from the .40 caliber clip found at the scene.

Sergeant Nathan Sexton, an officer with the Austin Police Department searched the Kia after getting permission from the owner, Juanita Beattie. There were ten 9-millimeter shell casings in the Kia. He also collected a light blue canvas bag in the car that contained a small jar with .2 ounces of marijuana inside, a scale, dime-bag-sized plastic bags "decorated with Batman," and a bandana. He agreed with defense counsel that dime bags and scales of that type are often connected with selling drugs.

Tyler Belknap, the forensic technical leader of the latent prints section with the Austin Police Department testified that Pates was a match for the fingerprints collected from the .40 caliber clip found at the crime scene.

Dr. Leisha Woods, the deputy medical examiner at the Travis County Medical Examiner's office, testified that she performed the autopsy on Gross's body. Gross had been hit by ten bullets total. Three grazed him causing "scrapes" along his skin, two went through his body, and five entered and were lodged inside his body. Of the ten wounds, four were fatal, which included: two from bullets that entered his mid-left back near the underarm and exited his upper left chest; one from a bullet that entered from his upper left back, went through his ribs and lungs, and lodged within the right side of his body; and one from a bullet that entered from his left back, perforated the left lung, fractured two vertebrae, and lodged in the right side of his neck. The gunshot wounds were the cause of death, and any of the four fatal wounds were individually fatal. She also testified that a bullet wound to his upper left arm fractured a major bone and thus would have caused bleeding that if untreated could have been fatal over time on its own. She testified that all of Gross's injuries were consistent with those that would be sustained if he was shot over his left shoulder while trying to duck and get out of the way of the bullets coming from his left—the direction Pates shot from. She ruled the cause of death "homicide."

The State's final witness was Alisha Beattie, Gross's mother. She testified that her son was eighteen when he died. She testified that prior to his death he had finished school, obtained a trade certificate, and was preparing for a job interview as an apprentice welder. She identified her son in court as the victim from the autopsy identification photo. The State rested its case.

11

The defense's sole witness during guilt-innocence was Pates. He testified that he met "Trey," Caleb Montes, and Preston Mixson playing basketball at the park near his apartment. He testified that Trey, Montes, and Mixson would brag about being in the Dolla Mob gang "all the time." He testified that he hung out with them because he was older and was trying to guide them away from that lifestyle.

On May 30, 2018, after 10 p.m., Pates was eating on his couch when he got a call from Mixson who wanted to come in and smoke. Mixson, Montes, and two men he did not know came into the apartment. Mixson reached into Pates's drawer and pulled out Pates's gun, looked at it, reached back in the drawer, grabbed a clip, and loaded it into the gun. Mixson pointed the gun at Pates and yelled a phrase that Pates testified is urban slang for "armed robbery." Pates testified that Mixson knew where Pates's gun would be in the drawer because Pates kept his lighter and gun in the same drawer and Mixson had been over to smoke with Pates before. Pates testified that he thought his life was in danger when Mixson pointed the gun at him. Pates testified that he thought if he moved wrong or sneezed that Mixson would shoot him in the head in his home. Mixson held the gun for about five to seven seconds and then Montes and the other two men ran out of the apartment. Mixson fired a shot that did not hit Pates, but Pates did not know where it was fired. Pates took cover. Pates testified that he was traumatized and in shock by the experience.

A neighbor called the police because they heard a gunshot. Pates asked for the incident report but told the responding officer he did not want to press charges and did not give a statement because Pates did not "want to snitch on them and agitate them and they come back to [his] house." Pates told the officer that the suspect was named "Pres," which is Mixson's nickname.

Pates reached out to Mixson by text while the officers were still at the scene. He testified that his text did not mean he was plotting against Mixson but that it meant "What the hell am I going to plot on you for?" Pates contacted Montes the next day, to find out what happened, but Montes was "being deceitful" with him. Pates had no further contact with any of the Dolla Mob members until June 27, 2018. Pates bought a new gun from Academy, which was registered to him, to replace the one Mixson stole. When asked by the State why he texted Mixson the night of the robbery and told him to bring his stuff back if he was afraid of him, Pates answered that he wanted his gun back because of the money he spent on it.

On June 27, 2018, the day of the Valero shooting, Pates was with "Cello," whom he only knew his real first name, which is Marcel. Pates asked Cello for a ride to the convenience store to get something to eat and a cigar. This was a store right next to his apartment complex where he lived and stopping there was part of his regular routine. Pates and Cello were chatting when they pulled into the parking space outside the store. Pates took off his seat belt, and when he looked to his right, he saw Mixson standing outside of the car. That was the first time he had seen Mixson since the robbery. Pates testified that he did not know Mixson would be there. Upon seeing Mixson, Preston thought "Oh, my God, this is the guy that nearly took my life." Preston testified that he "recognized the threat," so he reached into his book bag for his gun. He testified that Mixson "is known for having a gun and . . . he always has guns." While Pates rummaged in his backpack for his gun, he heard Mixson yell "pole," which he testified was slang for "gun." Pates testified that Mixson could not have seen his gun yet when he yelled "pole" because Pates's gun was still in his backpack. After yelling "pole," Mixson dashed into the car quickly, and Pates believed Mixson was moving for his own gun.

13

Pates testified he attempted to open the Kia's car door to attempt to knock the gun out of Mixson's hand. Pates testified he was trying to avoid shooting anybody if he could. Pates testified that he could not see into the car because of the window tint and did not know who was driving. Pates testified he did not know Gross. Pates explained that he did not know who fired the first shot but believed that he and Mixson were firing at the same time. In the moment, he believed that bullets were flying past him. He testified that when he started firing his gun he was in fear of his life. Pates admitted he fired some of the shots while he was turned away without looking where he was firing and admitted those shots were fired recklessly. He testified that he and Mixson exchanged shots until Mixson ran away and Pates got back into the car with Cello, and Cello took Pates home.

Pates testified that he then went to a friend's apartment and called Detective Cortez, who was the lead detective for the robbery case. Pates explained that he had been informing Detective Cortez of the threats that were being made against him by Mixson. Pates testified that the word around the neighborhood was that Mixson was bragging about robbing Pates. Pates testified that he did not intend to kill Gross. After talking to his family about what happened, Pates took the gun that was registered to him and had been used in the Valero shooting to his cousin's house and then turned himself in.

On cross, he admitted that he did not see a gun in Mixson's hand when he was outside the car either during the shooting or on the video. When asked by the State, "Based on everything that we know from this case and everything that you've just testified to, you would agree with me, right, that Davon Gross was an innocent third party who just happened to be in between where you were shooting at Preston, right?" Pates answered, "Yes, sir."

14

After hearing all the evidence, the jury rejected Pates's self-defense claim and found him guilty of murder. During the defense's case during the punishment phase, Pates testified on his own behalf that he understood he was responsible for his actions resulting in the loss of someone's life and that if he was able to address Gross's family, he would apologize to them for the unintended outcome of his actions. After hearing all of the presented punishment evidence, the jury assessed punishment at twenty-seven years imprisonment.

## DISCUSSION

Pates raises five issues asserting jury-charge error and single issues asserting ineffective assistance of counsel and insufficiency of the evidence to support the judgment.

### Jury Charge Error

Pates's first five issues allege that the trial court erred by including or excluding various instructions from the court's charge. Specifically he alleges that the trial court erred: (1) by denying his request for a self-defense instruction regarding the lesser included offense of manslaughter; (2) by denying his requested multiple assailants instruction; (3) by including a provoking-the-difficulty instruction; (4) by not instructing the jury that provoking-the-difficulty must be proven by the State beyond a reasonable doubt; and (5) by not including an instruction regarding the presumption of reasonable doubt regarding self-defense. Pates alleges that he was harmed by these alleged trial court errors both individually and cumulatively.

Jury charge error claims are reviewed under a two-pronged test in which the appellate court must determine: (1) whether the charge was erroneous, and (2) if there was an error, whether the error was harmful to the defendant. *Olivas v. State*, 202 S.W.3d 137, 143–44

(Tex. Crim. App. 2006); *Almanza v. State*, 686 S. W. 2d 157, 171 (Tex. Crim. App. 1985) (op. on rehearing).

The section of the jury charge addressing self-defense related instructions reads as follows:

V.

It is a defense to prosecution that the conduct in question is justified by law as self-defense. You are instructed that the State must disprove self-defense beyond a reasonable doubt.

A. Reckless Injury of Innocent Third Person

Even though an actor is justified in threatening or using deadly force against another, if in doing so he also recklessly injures or kills an innocent third person, the justification of self-defense is unavailable in a prosecution for the reckless injury or killing of the innocent third person.

B. Self-Defense

Upon the law of self-defense, you are instructed that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other person's use or attempted use of unlawful force. The use of force against another is not justified: (1) in response to verbal provocation alone; or (2) if the actor provoked the other's use or attempted use of unlawful force, unless the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter and the other nevertheless continues or attempts to use unlawful force against the actor.

C. Deadly Force

A person is justified in using deadly force against another if he would be justified in using force against the other, as above set out, and when he reasonably believes that such deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force. A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force as described by this section.

"Reasonable belief" means a belief that would be held by an ordinary and prudent person in the same circumstances as the defendant.

"Deadly force" means force that is intended or known by the persons using it to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury.

The jury may consider all relevant facts and circumstances surrounding the killing and all relevant facts and circumstances showing the condition of the mind of the of the accused at the time of the offense.

*Excluded self-defense for manslaughter instruction*

At trial, Pates's counsel requested a jury instruction on self-defense for the lessor included offense of manslaughter. The State argued that the instruction would not be proper because the case involved the killing of an innocent third party. No such instruction was included.

"A trial court errs to refuse a self-defense instruction if there is some evidence, viewed in the light most favorable to the defendant, that will support its elements." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). The trial court's instruction regarding innocent third parties tracks the relevant statutory language:

Even though an actor is justified under this chapter in threatening or using force or deadly force against another, if in doing so he also recklessly injures or kills an innocent third person, the justification afforded by this chapter is unavailable in a prosecution for the reckless injury or killing of the innocent third person.

Tex. Penal Code § 9.05. Thus, self-defense is not available when the charged offense alleges the reckless injury or killing of an innocent third person. *Id.* At trial, Pates agreed that Gross was an innocent third party that was in the way between him and his target, Mixson. If the jury had found that Pates did not intend to kill Mixson when he killed Gross (murder), then self-defense

17

would not be available as to whether Pates recklessly killed Gross (manslaughter) because Gross was an innocent third party. *Id.* §§ 19.02 ("A person commits [murder] if he: (1) intentionally or knowingly causes the death of an individual; [or] (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual . . . ."), .04 ("A person commits [manslaughter] if he recklessly causes the death of an individual."). The exclusion of the instruction is not error. *See Vidal v. State*, 418 S.W.3d 907, 911 (Tex. App.— Houston [14th Dist.] 2013, pet. ref'd) (holding trial court did not err in denying appellant's request for defense of third person instruction because appellant was prosecuted for reckless injury of innocent third person).

We overrule Pates's first issue.

*Exclusion of multiple assailants instruction*

During the charge conference, Pates's counsel requested a multiple assailants jury instruction. Counsel argued that the evidence supported that Pates was afraid of a gang and that the people in the car were involved in gang activity. The State argued at trial that the instruction should not be included because Pates testified that he did not know who was in the car; that assuming for argument's sake that Mixson was a member of a gang, there was no evidence presented that anyone else involved was a gang member; and that there was no evidence that anyone was working in concert with Mixson. The instruction was not included in the charge.

A defendant is entitled to a multiple assailants instruction when the evidence viewed from the defendant's standpoint shows an attack or threatened attack by more than one assailant. *Frank v. State*, 688 S.W.2d 863, 868 (Tex. Crim. App. 1985). It is not limited to those who are themselves aggressors, but also to those who are encouraging, aiding, or advising the aggressor. *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020). While the "multiple

18

assailants" requirement "does not require evidence that each person defended against was an aggressor in his own right; it requires evidence that the defendant had a reasonable fear of serious bodily injury from a group of people acting together." *Id.* 344.

In *Jordan*, the appellant was entitled to a multiple assailants instruction based on evidence that he and his friend were attempting to leave a restaurant after a heated altercation with a group of men when someone in the group punched and knocked out his friend; that appellant continued to retreat and was followed by the group of men; that someone in the group "fishhooked" his eye, turned him around, and grabbed him; that the appellant heard footsteps approaching; that the appellant fired three shots because he feared for his safety from the mob attacking him and his friend; and that two of the members of that mob were shot. *Id.* at 344. Similarly, in *Sanders v. State*, 632 S.W.2d 346 (Tex. Crim. App. 1982), Sanders was entitled to a multiple assailants instruction after fatally shooting at a group of several men that chased him into a parking lot after someone had hit Sanders in the head with a pool cue.

On appeal, Pates argues that Gross was aiding Mixson's attack on Pates by driving him to the Valero. He argues that the evidence established the following: that Mixson had robbed Pates, pointed a gun at him, and fired a shot a month before the Valero shooting; that Mixson and others he hung out with were in a gang; that Gross drove Mixson to the Valero near Pates's home, which was twenty minutes away; that Mixson arrived with four other people in the car with him; and that gang related items—drugs, bandanas, and guns—were found in the backpack that came out of the Kia. However, no evidence was presented that Gross was a gang member, had any weapons, or otherwise was part of an attack plot against Pates. Further, Pates testified that he did not know who was in the car and could not see in. *See Jordan*, 593 S.W.3d at 344 (holding that "multiple assailants" instruction "requires evidence that the defendant had a

19

reasonable fear of serious bodily injury from a group of people acting together.").  The exclusion of the instruction was not error.  *See Jordan*, 593 S.W.3d at 343 ("A trial court errs to refuse a self-defense instruction if there is some evidence, viewed in the light most favorable to the defendant, that will support its elements.").

We overrule Pates's second issue.

*Inclusion of provoking-the-difficulty instruction*

In his third issue on appeal, Pates argues that the evidence at trial was not sufficient to support a provocation jury instruction.  We disagree.

A jury instruction on provoking the difficulty is required when there is sufficient evidence: (1) "that the defendant did some act or used some words that provoked the attack on him," (2) "that such act or words were reasonably calculated to provoke the attack," and (3) "that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other."  *Elizondo v. State*, 487 S.W.3d 185, 197 (Tex. Crim. App. 2016) (citing *Smith v. State*, 965 S.W.2d 509, 513 (Tex. Crim. App. 1998).  Such instruction is a limitation on a defendant's right to self-defense.  *Id*.  To determine whether the trial court properly included a provocation instruction in the jury charge, we are required to address all three of the *Smith* elements.  *Id.*  All three *Smith* elements are questions of fact.  *Smith*, 965 S.W.2d at 513–14.  We review the evidence "in the light most favorable to giving the instruction" and determine whether there was sufficient evidence from which a rational jury could have found each element of provocation beyond a reasonable doubt.  *Id.* at 514.

"With regard to the first of the three *Smith* elements, there must be some evidence from which a rational jury could find beyond a reasonable doubt that some act or words of the defendant actually caused the attack on him."  *Elizondo*, 487 S.W.3d at 199.  Mixson testified

20

that he and Gross had been at the Valero for a while when Pates pulled up next to them, that Mixson reentered the vehicle and told Gross to leave, that Pates exited his vehicle with a gun and pointed it at the vehicle that Mixson and Gross occupied before shooting, and that Mixson then shot back. Pates testified that when he saw Mixson standing outside the Kia he reached into his own backpack to retrieve his gun and that Mixson then yelled "pole," which means "gun." Although Pates testified that Mixson could not have seen his gun yet, and on appeal argues that Mixson yelling gun meant that Mixson was going for his own gun, the jury could have reasonably believed that Pates reacting to Mixson staring at him by reaching into his bag for his own gun under the circumstances could have been an act that caused Mixson to then go for his own gun. Further, the surveillance video shows Pates getting out of the Volvo while holding a gun and then trying to open the Kia's driver's side door. Additionally, a witness testified that Pates was yelling right before he started shooting. The jury could have found beyond a reasonable doubt that Pates committed some act or words that caused Mixson to pull his own gun and begin shooting.

We move to the second *Smith* element: that the defendant's actions or words were reasonably calculated to provoke the attack. *See id.* at 199. "[T]his element is satisfied if there is some evidence from which the jury could rationally conclude beyond a reasonable doubt that [appellant's] acts or words—taken alone or considered in conjunction with the relations of the parties and other circumstances surrounding the difficulty—were reasonably capable of causing the attack or had a reasonable tendency to cause the attack on him." *Id.* According to Pates's own testimony he was the first to reach for a firearm. Mixson's testimony and the surveillance video suggest that Pates was the first to display a firearm and that Pates chose to move towards Mixson and Gross while Mixson and Gross were taking action to move away from Pates. The

21

jury could have reasonably found beyond a reasonable doubt that Pates's actions were reasonably calculated to provoke the attack. *See id.* (act of "retrieving his gun" was one act committed by appellant that was reasonably calculated to provoke attack).

We now consider the third *Smith* element: "that there be some evidence from which a rational jury could find beyond a reasonable doubt that the act was done, or the words were used, for the purpose and with the intent that the defendant would have a pretext for killing the victim." *Id.* at 200. Pates argues that "[i]t is inconceivable that a defendant orchestrated a set of events to kill a man that he did not even know." Pates correctly points to cases supporting that the defendant not knowing the person he was defending against can render the evidence insufficient for the jury to find that his actions were pretext to kill the previously unknown victim. *See id.* at 204 (citing *Bennett v. State*, 726 S.W.2d 32, 36 (Tex. Crim. App. 1986)). In *Elizondo*, the defendant was arguing with the victim's son when the victim attacked him, and the defendant killed the victim in alleged self-defense. *Id.* In that case, the provoking the attack instruction was improperly given because Elizondo could not have intended for a man he did not not know to intervene in his argument just to kill that unknown man. *Id.* However, this case is different because unlike in *Elizondo*, here it was Mixson and not Gross that Pates was allegedly defending himself against. Based on Pates's history with Mixson regarding the robbery and text messages exchanged a month prior and his act of exiting his vehicle gun in hand, the jury could have reasonably found beyond a reasonable doubt that Pates's actions were done with the intent of provoking Mixson into attacking him so that he would have pretext for killing Mixson, but in reality he killed Gross instead.

It was not error to include the instruction because "a rational jury could find every element of provocation beyond a reasonable doubt." *Id.* at 197. We overrule Pates's third issue.

22

In his fourth appellate issue, Pates's argues that the provocation instruction did not advise the jury that the State had to prove beyond a reasonable doubt that Pates provoked the difficulty. Specifically, Pates challenges two portions of the jury instruction:

> The use of force against another is not justified . . . if the actor provoked the other's use or attempted use of unlawful force.
>
> . . . .
>
> A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force as described by this section.

A proper provocation instruction must make it clear to the jury that the State has the burden to prove provocation beyond a reasonable doubt. *Id.* at 207; *Reeves v. State*, 420 S.W.3d 812, 818 n. 30 (Tex. Crim. App. 2013). Here, the State argues that other portions of the charge made it clear that the State had the burden to "disprove self-defense beyond a reasonable doubt." Pates argues that the two challenged instructions should have included additional language that the State must prove beyond a reasonable doubt that the defendant provoked the difficulty.

Section V of the jury charge is the section including the law of self-defense applicable to the case and begins with an umbrella statement that the State must disprove self-defense beyond a reasonable doubt: "You are instructed that the State must disprove self-defense beyond a reasonable doubt." It then recites the law, which includes both challenged sections, in Sections B and C by following the statutory language verbatim:

> (b) The use of force against another is not justified . . . .

23

(4) if the actor provoked the other's use or attempted use of unlawful force, unless:

(A) the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; and

(B) the other nevertheless continues or attempts to use unlawful force against the actor . . . .

(e) A person who has a right to be present at the location where the force is used, who has not provoked the person against whom the force is used, and who is not engaged in criminal activity at the time the force is used is not required to retreat before using force as described by this section.

Tex. Pen. Code § 9.31(b)(4), (e).

Pates argues that *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008) supports that the inclusion of the State's burden in a different Section would signal to the jury that the burden does not apply in the sections it is missing. However, unlike here, the charge in *Allen* included the self-defense paragraph with the State's burden to disprove beyond a reasonable doubt and then a separate paragraph on the consent defense without any burden mentioned. *Id.* The Court of Criminal Appeals agreed with appellant that the inclusion of the State's burden in one defensive theory paragraph and not the other could reasonably signal to the jury that a different burden applied to the consent issue. *Id.* This is not the situation here, because the burden was not included in the paragraph of one but not other defensive theories but rather in the introduction section that applied to all the underlying subsections.

Further, "[a] jury charge that tracks the language of a particular statute is a proper charge." *Malone v. State*, 405 S.W.3d 917, 927 (Tex. App.—Beaumont 2013, pet. ref'd), as corrected (July 1, 2013) (citing *Martinez v. State*, 924 S.W.2d 693, 699 (Tex. Crim. App. 1996)). Because the complained of instructions track the relevant statutory language and do not

24

otherwise include misleading or confusing language regarding the State's burden, the provocation charge in this case did not erroneously mislead the jury regarding the State's burden of proof regarding provocation. *See Woodruff v. State*, No. 08-19-00141-CR, 2021 WL 3667272, at *6 (Tex. App.—El Paso Aug. 18, 2021, pet. ref'd) (finding no jury charge error when self-defense section tracked statute).

We overrule Pates's fourth issue.

*Exclusion of presumption of reasonable belief instruction*

In his fifth appellate issue, Pates argues that the trial court erred by not sua sponte including a jury instruction regarding the presumption that his belief that deadly force was immediately necessary was reasonable.

A presumption that favors the defendant is required to be submitted to the jury "if there is sufficient evidence of the facts that give rise to the presumption . . . unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact." Tex. Penal Code § 2.05(b)(1); *Morales v. State*, 357 S.W.3d 1, 7 (Tex. Crim. App. 2011). Regarding the specific presumption at issue, the Penal Code establishes that:

> (b) The actor's belief under Subsection (a)(2) that the deadly force was immediately necessary as described by that subdivision is presumed to be reasonable if the actor:
>
> (1) knew or had reason to believe that the person against whom the deadly force was used:
>
>      . . . .
>
>      (C) was committing or attempting to commit [murder];
>
> (2) did not provoke the person against whom the force was used; and

25

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

Tex. Penal Code § 9.32.

Here, the State concedes that there was some evidence presented that could support the jury finding that Pates had reason to believe Mixson was attempting to commit murder and that he did not provoke the attack. However, the State argues that Pates is not entitled to the instruction because he was involved in criminal activity at the time. Specifically, the State argues that he was committing Class B criminal trespass because he had a firearm and the Valero had posted a notice that firearms are not allowed. *See id.* § 30.05.

"A person commits [criminal trespass] if the person enters or remains on or in property of another, including . . . a building, . . . without effective consent and the person: (1) had notice that the entry was forbidden; or (2) received notice to depart but failed to do so." *Id.* § 30.05(a). Notice includes "a sign or signs posted on the property or at the entrance to the building, reasonably likely to come to the attention of intruders, indicating that entry is forbidden." *Id.* § 30.05(b)(2)(C). "A person may provide notice that firearms are prohibited on the property by posting a sign at each entrance to the property." *Id.* § 30.05(c). A photo showing that such a sign was posted on the door of the convenience store was admitted into evidence. However, the record contains no evidence of a similar sign being posted at the entrances of the parking lot, nor is there any evidence in the record that Pates entered the store with his firearm on the day of the Valero shooting. Thus, the evidence as a whole did not clearly preclude a finding beyond a reasonable doubt of the presumed fact. *See id.* § 2.05(b)(1). Thus, the exclusion of the defensive presumption was error.

26

Because Pates did not raise this issue at trial, we will consider whether it caused egregious harm. *Almanza*, 686 S.W.2d at 171 ("[I]f no proper objection was made at trial and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.'"). In conducting the *Almanza* analysis, we consider four factors: (1) the charge as a whole; (2) the state of the evidence and contested issues; (3) arguments of counsel; and (4) any other relevant information. *Olivas*, 202 S.W.3d at 144.

First, reviewing the charge as a whole, as we have discussed previously, the charge otherwise correctly instructed the jury regarding the law of self-defense. Because based on the facts of this case the erroneously missing presumption instruction would have allowed the jury to disregard the presumption if it found that Pates lacked knowledge that Mixson was attempting to commit murder or if it found that Pates had provoked the attack, this factor does not establish egregious harm. *See Villarreal v. State*, 453 S.W.3d 429, 435–36 (Tex. Crim. App. 2015) (concluding that omission of presumption from jury charge was not egregious harm partially because jury could have determined appellant either did not have knowledge that complainant was attempting to commit murder or could have determined that appellant was engaged in criminal activity at time).

Turning to the evidence as a whole, Pates argues that the omission of the presumption instruction constitutes egregious harm because in addition to self-defense being his sole defense, the contested issue within his self-defense claim was whether his belief that the deadly force was immediately necessary was reasonable. Although relevant, this is not dispositive. *See Polk v. State*, No. 13-18-00347-CR, 2019 WL 3721345, at *6 (Tex. App.—Corpus Christi–Edinburg Aug. 8, 2019, pet. ref'd) (mem. op., not designated for publication)

27

(holding that there was not egregious harm when "although self-defense was Polk's only defense, the only evidence supporting that defense was his own testimony and it was contradicted by all of the other evidence in the record."). Rather, "it is appropriate to consider the plausibility of the evidence raising the defense, as at least one factor among others." *Allen v. State*, 253 S.W.3d 260, 267–68 (Tex. Crim. App. 2008). Further, "the mere existence of conflicting testimony surrounding a contested issue does not necessarily trigger a finding of egregious harm." *Villarreal*, 453 S.W.3d at 436.

Here, the evidence against Pates's self-defense theory was substantial. The surveillance video shows him arrive second on the scene, exit his vehicle as Mixson reenters his, attempt to open the door of the Kia, then begin to fire shots into the Kia, and continue to fire as the driver reverses away from him. It was his theory that Mixson arrived with fellow gang members in an attempt to murder him based on a robbery Mixson had allegedly committed against him a month prior, based on his allegation that the word on the street was that Mixson was bragging about the robbery, and based on the way Mixson was looking at Pates from outside the car the day of the shooting. According to Pates's own testimony, he was reaching for his own gun in his bag before Mixson yelled "pole" and got back in the Kia. The lead detective testified that based on her understanding of the police report from the robbery, the shooter "Pres" shot up in the air outside of Pates's apartment, and Pates was uncooperative with the investigation. Pates testified he was uncooperative because he was scared of the gang members. However, while police were still at his apartment, Pates texted Mixson telling him to return and bring his gun back. Further, his actions after the Valero shooting were not consistent with self-defense. *See Aguilar-Motino v. State*, No. 01-08-00527-CR, 2009 WL 3321418, at *3 (Tex. App.—Houston [1st Dist.] Oct. 15, 2009, pet. ref'd) (mem. op., not designated for publication)

28

(highlighting evidence of defendant's conduct after stabbing victim when concluding that jury could reasonably decide that defendant committed aggravated assault and reject self-defense claim). It is uncontroverted that Pates fled the scene, that the gun he used was not recovered, and that he only turned himself in after his photo was circulated by the media. The evidence weighs against egregious harm.

Third, we consider the arguments of counsel. The State did not specifically mention "reasonable belief" in its arguments. The State argued that Pates was motivated by revenge against Mixson for robbing him a month prior. The State's argument focused on Pates's actions not being reasonable and not being consistent with self-defense. It also argued that Mixson was the one actually entitled to self-defense and that Pates had provoked Mixson, which is one issue that could negate the presumption if given. Defense counsel focused on the State's burden to disprove self-defense beyond a reasonable doubt. Counsel argued extensively that the focus should be on whether Pates had a "reasonable belief" not on whether his actions appeared reasonable in hindsight. Counsel also argued that the twenty seconds it took for Pates to react after he pulled into the Valero demonstrate that he was not enacting a planned revenge plot but rather was reacting to the threat Mixson posed. Counsel's arguments do not support egregious harm.

Not finding any additional relevant information from the record, we conclude that the record fails to indicate the existence of egregious harm. Further, because this charge error is the only identified error raised by Pates's claims, we decline to consider the doctrine of cumulative error in this case. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("[W]e are aware of no authority holding that non-errors may in their cumulative effect cause error.").

**Ineffective Assistance of Trial Counsel**

In his next issue on appeal, Pates argues that his trial counsel provided ineffective assistance of counsel by failing to request a sudden passion instruction. He argues on appeal that the "expressions on his face" in the surveillance video "clearly show the passion he was gripped by," and thus established his entitlement to a sudden passion instruction and that no reasonable trial strategy could support his counsel not requesting the instruction. We disagree.

To prevail in his claim of ineffective assistance of counsel, Pates must prove by a preponderance of the evidence that: (1) his counsel's performance was deficient, and (2) the deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hernandez v. State*, 988 S.W.2d 770, 772–74 (Tex. Crim. App. 1999). The review of a trial counsel's representation on an ineffective-assistance challenge is highly deferential to the counsel's professional judgment. *Strickland*, 466 U.S. at 689. In meeting the first prong of the *Strickland* test, Pates must overcome a strong presumption that his counsel's conduct falls within the wide range of reasonably professional assistance. *Id.* To meet the second prong of the test, appellant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

To be entitled to receive a "sudden passion" instruction at the punishment phase, a defendant must prove that he caused the death of a person under the immediate influence of sudden passion arising from adequate cause. Tex. Penal Code § 19.02(d). "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. *Id.*

30

§ 19.02(a)(1). "Sudden passion" means passion directly caused by and arising out of the provocation by the deceased or someone acting with the deceased that arises at the time of the offense and is not solely the result of former provocation. *Id.* § 19.02(a)(2). The analysis in "sudden passion" cases divides into two inquiries: (1) the record must demonstrate some evidence of "adequate cause"—a cause sufficient to produce anger, rage, resentment, or terror in a person of ordinary temper rendering the person incapable of cool reflection; and (2) the record must demonstrate some evidence of "sudden passion"—an excited and agitated state of mind at the time of the killing caused by direct provocation by the victim or someone acting with the victim. *Merchant v. State*, 810 S.W.2d 305, 309 (Tex. App.—Dallas 1991, pet. ref'd).

Further, a defendant asserting an ineffective-assistance claim must overcome a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance. *Strickland*, 466 U.S. at 689. This burden is made more difficult when, as in this case, no motion for new trial asserting ineffective assistance is filed allowing for a record to be developed focused on the conduct of counsel. *See Gravis v. State*, 982 S.W.2d 933, 937 (Tex. App.—Austin 1998, pet. ref'd). "[A]ny allegation of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). Generally, a reviewing court will not speculate about counsel's trial strategy. *Mayhue v. State*, 969 S.W.2d 503, 511 (Tex. App.—Austin 1998, no pet.). "A substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on direct appeal." *Thompson*, 9 S.W.3d at 813.

In this case, we have no record from which we may discern that counsel's performance was not based on sound strategy. Pates cites to *Storr v. State*, 126 S.W.3d 647, 653

31

(Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) to support his argument that no reasonable trial strategy could exist for counsel to not request a sudden passion instruction. However, the facts of *Storr* do not support Pates's argument. In *Storr,* the court found that there was no reasonable trial strategy for counsel to not request a "returned to safe place" instruction during the punishment phase of a kidnapping trial when witness testimony "conclusively" established that the kidnappers returned the victim to where he had been abducted from and then the victim safely made it home. *Id.* at 652 ("This case is unique because the evidence conclusively establishes that appellant voluntarily released the complainant in a safe place."). Here, unlike in *Storr*, the only evidence presented of sudden passion would be the same evidence presented in support of Pates's self-defense theory that the jury had already rejected. *See Chavez v. State*, 6 S.W.3d 56, 65 (Tex. App.—San Antonio 1999, pet. ref'd) ("[E]xcept in rare instances, when the State's evidence is sufficient to overcome a claim of self-defense, it will also be sufficient to show the absence of sudden passion."). We disagree with Pates that the surveillance video so clearly displays facial expressions that establish sudden passion to the extent that no reasonable trial strategy could support a decision not to raise sudden passion. We are not convinced that under the facts of this case there is no reasonable trial strategy to support trial counsel not requesting the instruction. Accordingly, we overrule Pates's "sudden passion" ineffective-assistance claim.

**Sufficiency of the Evidence**

In his final appellate issue, Pates argues that the evidence was legally insufficient to support the jury's determination that he was not acting in self-defense. We disagree.

"When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational

32

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017)). "This standard requires the appellate court to defer 'to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). "We may not re-weigh the evidence or substitute our judgment for that of the factfinder." *Id.* (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). Although factfinders "may not speculate about the meaning of facts or evidence," they are permitted to "draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial." *Id.* (citing *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016); *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007)). "We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution." *Id.* (citing *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012)). This is because the factfinders are "the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony." *Id.* (citing *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13).

A person commits murder if the person "intentionally or knowingly causes the death of an individual," or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code § 19.02(b)(1),

(2). A person is justified in using force against another when and to the degree he reasonably believes it is immediately necessary to protect himself against the other's use or attempted use of unlawful force. *Id.* § 9.31(a). "[T]he issue of self-defense is an issue of fact to be determined by the jury." *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). When a defendant raises the issue of self-defense, "the State has the burden of persuasion in disproving the evidence of self-defense," but it is not required to "affirmatively produce evidence refuting the self-defense claim, but rather . . . to prove its case beyond a reasonable doubt." *Id.* In evaluating the sufficiency of the evidence supporting a jury's rejection of a claim of self-defense, we ask not whether the evidence refuted the self-defense testimony but whether, viewing the evidence most favorably to the prosecution, a rational juror could have found against the claim of self-defense beyond a reasonable doubt. *Id.* at 914 ("A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory."). Evidence supporting a claim of self-defense "will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Id*.

Pates's defensive strategy at trial was to argue that Mixson was a dangerous gang member that had robbed Pates less than a month prior to the offense; that Mixson had gone to the store near Pates's apartment intentionally; and that when Pates saw Mixson, who was known for always having a gun, Pates "recognized the threat" and acted by getting out of the car he was in and after an unsuccessful attempt to open the other car's door and knock the gun he assumed Mixson had out of his hand, he fired his gun into the car with the attempt to defend himself against Mixson, but unintentionally hit Gross instead, who Pates claims he did not know was there because of the darkly tinted windows. On appeal, Pates argues that Mixson showed up

34

with four other gang members, with Gross driving, to ambush Pates and that Pates survived because he reacted the way he did.

However, the jury could have reasonably disbelieved Pates's story and believed the State's depiction of events. The State argued at trial that Pates was seeking revenge against Mixson for stealing his gun a month prior and that when he saw him at the Valero Pates chose that time to enact his revenge. Mixson testified that he was at the store so that his younger brother could get candy. The jury was shown a video showing the three juveniles immediately get out of the Kia and go into the store where they remained during the shooting. When shots were fired, Gross immediately tried to escape by reversing out of the parking spot. The jury could have reasonably believed that these were not the actions of individuals that were there to carry out an ambush. The jury also heard testimony that Pates was uncooperative with police regarding the robbery against him, and that he was texting Mixson to come back to his apartment and bring his gun back to him. The jury could have reasonably disbelieved Pates's explanation that he feared for his life at the sight of Mixson at the Valero based on the evidence of his actions following the robbery. The lead detective also testified that based on her reading of the police report, she thought the robbery involved a shot fired into the air outside of Pates's apartment instead of at him inside his apartment. A rational juror could have found against the claim of self-defense beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914.

Pates heavily relies on his argument that Mixson was an unreliable witness, that it was unreasonable for him to travel twenty minutes across town to get candy, and that Mixson arrived with four other individuals, drugs, gang paraphernalia, and a gun. However, Pates testified that he knew Mixson from playing basketball near his apartment and that Mixson had hung out in his apartment and smoked marijuana with him, and Pates had a gun with him at the

35

Valero. The jury could have reasonably believed that it was reasonable for Mixson to be stopping for candy at a gas station near where Pates said he met him and other individuals Mixson was friends with. The jury could have also believed that Mixson's involvement with marijuana and guns did not make him a threat to Pates considering the evidence also tied Pates to marijuana and guns. It was the responsibility of the jury to resolve the conflicts in evidence and determine witness credibility. *See Zuniga*, 551 S.W.3d at 732. The jury could have reasonably believed that the evidence did not support Pates's self-defense argument.

Further, the evidence was sufficient to support Pates's conviction for murder. Tex. Penal Code § 19.02(b)(1), (2). Pates admitted and the surveillance video supported that he fired his gun into the Kia at Mixson. The medical examiner testified that Gross, who was in between Pates and Mixson, died from gun shot wounds that originated from the direction that Pates was shooting.

We overrule Pates's sufficiency of the evidence claim.

## CONCLUSION

Because we overruled all of Pates's issues, we affirm the trial court's judgment of conviction.

_____
Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed: May 11, 2023

Do Not Publish